UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

UNITED STATES OF AMERICA

- against -

LEWIS ALLEN and LUIS VALERIO,

                              Defendants.

-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/08

**OPINION AND ORDER**

07 Cr. 235 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Defendants Lewis Allen and Luis Valerio pled guilty to the sale of a relatively small amount of crack cocaine. The Government contends that defendants were involved in a much broader conspiracy to distribute crack . A *Fatico* hearing was held on March 17, 2008. I now make findings of fact for the purpose of calculating the appropriate offense level based on the evidence presented at the hearing and to resolve certain claims raised by defendants with respect to the Government's conduct.

## II. BACKGROUND

### A. Facts

On March 6, 2007, in Bronx County, New York, defendants Lewis Allen and Luis Valerio conspired to distribute, possessed with intent to distribute,

and distributed more than five grams of crack cocaine.[1] Valerio was indicted on March 27, 2007, and Allen was indicted on April 9, 2007.

On March 30, 2007, following Valerio's arrest, Magistrate Judge Gabriel Gorenstein held a detention hearing at which the Government represented that Valerio was "a street level pitcher for a large crack cocaine organization centered on Gerard Avenue between 167th and McLaughlin."[2] The Government further stated that the individuals at the top of the organization had been indicted in the Fall of 2006 and that the organization was "violent."[3] The Government did not arrest Valerio at that time, possibly because he was seventeen years old, but he was eventually arrested after he continued selling crack following his eighteenth birthday.[4] The Government further represented that there had been a murder in June of 2006 and there was "evidence that Mr. Valerio was involved in that

---

[1]     *See* 7/30/07 Transcript of Plea Allocution of Lewis Allen ("Allen Plea Tr.") at 16, 17; 8/1/07 Transcript of Plea Allocution of Luis Valerio ("Valerio Plea Tr.") at 15. The Indictments charged that the conspiracy spanned the period from January 2007 through March 26, 2007. *See* Indictment; Superseding Indictment.

[2]     *See* 3/30/07 Transcript of Valerio Criminal Cause for Detention Hearing Before the Honorable Gabriel W. Gorenstein ("Valerio Hearing") at 3.

[3]     *Id.*

[4]     *See id.* Valerio turned eighteen on December 14, 2006. *See* 2/15/08 Presentence Investigation Report of Defendant Luis Valerio ("Valerio PSR") at 2. Allen turned eighteen on August 31, 2006. *See* 2/15/08 Presentence Investigation Report of Defendant Lewis Allen ("Allen PSR") at 2.

2

murder, that he had a gun. He was one of the two shooters."[5]

The Government notified Valerio's counsel that it possessed an audio tape of Valerio speaking with a cooperating witness from November 16, 2006 (prior to the charged conspiracy). In response to Valerio's request for the tape, the Government stated that "the recording is not relevant to the trial charges . . . ."[6]

The Government apparently offered defendants plea agreements that would have stipulated a sentencing range under the United States Sentencing Guidelines (the "Guidelines") but would have prohibited them from requesting a departure below that range.[7] Defendants did not accept the proposed plea agreements. However, the Government sent defendants letters (the "*Pimentel* Letters") advising them of the Government's calculation of their likely sentences under the Guidelines. The *Pimentel* Letters, which state that they "form[] no part of any plea agreement" between the Government and defendants,[8] purport to

---

[5]     Valerio Hearing at 4.

[6]     7/30/07 Email from Assistant United States Attorney ("AUSA") Michael English to Don D. Buchwald, Attorney for Valerio, attached to 2/22/08 Letter from Buchwald to the Court ("Buchwald Ltr.")

[7]     *See* Buchwald Ltr.

[8]     7/24/07 Letter from AUSA English to Defendant Lewis Allen ("Allen *Pimentel* Ltr.") at 1; 7/24/07 Letter from AUSA English to Defendant Luis Valerio ("Valerio *Pimentel* Ltr.") at 1.

3

explain how the Guidelines would apply to defendants' sentences. First noting

that "[t]he Government presently believes that the [Guidelines] apply to the crime

charged in the Indictment as follows," the letters state that because "[t]he offense

conduct, *including all relevant conduct* under U.S.S.G. § 1B1.3, involved at least

150 grams but less than 500 grams of cocaine base,"[9] defendants' base offense

level was equivalent to 32.[10] After calculating defendants' criminal histories and

other adjustments, the letters observe that

> [t]he foregoing Guidelines calculation is based on the facts
> and information *presently known to the [Government]*.
> Nothing in this letter limits the right of [the Government]
> to change its position at any time as to the appropriate
> Guidelines calculation in this case, and to present to the
> sentencing Judge and/or Probation Department, either
> orally or in writing, any and all facts and arguments
> relevant to sentencing . . . that are available to the
> [Government] at the time of sentencing. . . . [The
> Government] cannot and does not make any promise or
> representation as to what sentence the defendant[s] will

---

[9]     The source of these quantities is unclear. Defendants allocuted only
to the sale of slightly over five grams of crack cocaine. *See* Valerio Plea Tr. at 15-
16; Allen Plea Tr. at 16-17.

[10]     Allen *Pimentel* Ltr. at 2; Valerio *Pimentel* Ltr. at 2 (emphasis added).
The letters actually concluded that under the November 2006 revision of the
Guidelines, the base offense level was 34. The offense levels and sentence ranges
in the text of the *Pimentel* Letters have been adjusted in accordance with the
November 2007 Guidelines.

4

receive.[11]

Pursuant to section 3E1.1 of the Guidelines, defendants would receive a three-level reduction for acceptance of responsibility and timely notice of intention to plead guilty. Allen's *Pimentel* Letter thus concludes that at Criminal History Category I, offense level 29, Allen's Guidelines range was 87 to 108 months. Valerio's *Pimentel* Letter states that he would receive a two-level enhancement for possession of a firearm in the course of a narcotics conspiracy pursuant to section 2D1.1(b)(1) of the Guidelines. Based on Criminal History Category III, offense level 31, his Guidelines range was 135 to 168 months.[12]

On July 30, 2007, Allen pled guilty to Counts One and Two of the Superseding Indictment, which were, respectively, conspiracy to distribute and to possess with intent to distribute five or more grams of crack cocaine in violation of section 846 of title 21 of the United States Code and distributing or transferring five or more grams of crack cocaine in violation of sections 812 and 841 of title 21 of the United States Code.[13] On August 1, 2007, Valerio pled guilty to the same

---

[11]     Allen *Pimentel* Ltr. at 3; Valerio *Pimentel* Ltr. at 4 (emphasis added).

[12]     *See* Valerio PSR ¶ 5.

[13]     *See* Allen Plea Tr.

5

offenses.[14] At their pleas, each defendant admitted to the distribution of only slightly more than five grams of crack.[15] With respect to each count, defendants were told that they faced "a maximum sentence . . . of forty years' imprisonment" and "a mandatory minimum sentence of five years' imprisonment . . . ."[16] Defendants responded affirmatively when asked if they understood that "the guideline range found to apply in your case may turn out to be different from any range you've discussed with your attorney and it may be different from any range that your attorney has discussed with the government . . . ."[17]

Following defendants' pleas, the Government alleged that defendants worked as street-level distributors for the crack cocaine distribution organization run by Angel Martinez (the "Martinez Organization" or the "Organization") from 2004 through 2006.[18] The Martinez Organization allegedly controlled "all crack distribution on Gerard Avenue between E. 167th Street and McClellan Avenue"

[14]     *See* Valerio Plea Tr.

[15]     *See id.* at 15-16; Allen Plea Tr. at 16-17.

[16]     Valerio Plea Tr. at 9, 11; Allen Plea Tr. at 9, 11.

[17]     Valerio Plea Tr. at 12; Allen Plea Tr. at 12-13.

[18]     *See* Allen PSR ¶ 10; Valerio PSR ¶ 11.

6

for approximately fifteen years.[19]  Valerio and Allen allegedly worked twelve-hour

shifts for the Martinez Organization, selling bundles of crack cocaine on the

streets.  Each bundle allegedly contained fifteen bags of crack cocaine

(approximately 1.65 grams per bundle) and cost $150.  During one twelve-hour

shift, defendants would typically sell five to seven bundles of crack cocaine.[20]  The

Martinez Organization allegedly distributed approximately thirty to forty-five

bundles per week.  The PSRs concluded that the Martinez Organization sold

approximately 200 to 280 grams of crack cocaine per month and that this quantity

was reasonably foreseeable to defendants.  The PSRs estimated that over the

period from defendants' first involvement in the Organization, in "late 2004 or

early 2005," until the arrest of several members of the Organization in November

2006, defendants distributed between 4.8 and 6.72 kilograms of crack cocaine.[21]

The PSRs also stated that both defendants possessed firearms in connection with

the sale of crack cocaine.[22]

     Based on the heightened quantity of crack cocaine, the PSRs

---

19    Allen PSR ¶ 10; Valerio PSR ¶ 11.

20    *See* Allen PSR ¶ 11; Valerio PSR ¶ 12.

21    Allen PSR ¶¶ 10, 14; Valerio PSR ¶¶ 12, 15.

22    *See* Allen PSR ¶ 12; Valerio PSR ¶ 13.

concluded that the base offense level was 38.[23]  Because defendants possessed

firearms in connection with the offense, the offense level was raised to 40.  After

deducting three levels for timely acceptance of responsibility, the total offense

level was 37.  Based on defendants' Criminal History categories and offense level

37, the Guidelines range was 262 to 327 months for Valerio and 210 to 262

months for Allen.[24]  The PSR recommended sentences of 180 months for both

defendants, concluding that ten years would be appropriate for the distribution of

crack cocaine and five years for the possession of a firearm.[25]

## B.    Procedure

Because there were disputed issues of fact with respect to the drug

quantity and possession of a firearm, this Court held a *Fatico* hearing on March

17, 2008 (the "*Fatico* Hearing").[26]  Defendants also asked the Court to address

whether the Government should be held to the statements it made in the *Pimentel*

Letters regarding relevant conduct.  Additionally, Valerio maintains that his guilty

---

[23]     The PSRs applied the November 2007 revision of the Guidelines.

[24]     *See* Allen PSR ¶ 16; Valerio PSR ¶ 18.

[25]     *See* Allen PSR at 16-17; Valerio PSR at 18-19.

[26]     *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978) (discussing
the appropriate standard for pre-sentence evidentiary hearings).  The *Fatico*
Hearing was continued on March 19, 2008.

8

plea was based in part on the Government's statement that because the November
16, 2006 audio tape was not relevant to the charged conduct, he presumed that the
conduct of the Martinez Organization was also not relevant.[27] Defendants further
argue that holding them responsible for the larger quantity of crack cocaine
distributed by the Martinez Organization violates the Fifth and Sixth
Amendments' guarantees of due process and trial by jury.[28] Defendants finally
argue that if they are held responsible for the larger quantity, they are entitled to
reductions in their offense levels as minimal participants under section 3B1.2(a) of
the Guidelines.[29]

## III. APPLICABLE LAW

### A. Relevant Conduct

Section 1B1.3(a)(1)(B) of the Guidelines provides that in calculating
the base level of an offense, a court shall take into account "in the case of a jointly
undertaken criminal activity . . . all reasonably foreseeable acts and omissions of
others in furtherance of the jointly undertaken criminal activity[] that occurred

---

[27]     *See* Buchwald Ltr.

[28]     *See id.*

[29]     *See id.*

9

during the commission of the offense of conviction . . . ."[30] Thus, before a defendant may be held responsible for the actions of others, the Government "must prove by a preponderance of the evidence the existence of 'a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others.'"[31] Because "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy . . . the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake . . . ."[32] Thus, a sentencing court must first make a particularized finding as to the jointly agreed-upon scope of criminal activity.[33]

The extent to which members of a criminal conspiracy agreed to undertake the illegal activity of the entire organization can be a difficult issue. It is clear that "a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts."[34] Thus, "'the scope of

---

[30]     Guidelines § 1B1.3(a)(1)(B).

[31]     *United States v. Rizzo*, 349 F.3d 94, 100 (2d Cir. 2003) (quoting Guidelines § 1B1.3(a)(1)(B)).

[32]     Guidelines § 1B1.3 cmt. n.2.

[33]     *See United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

[34]     *Id.* at 575.

10

the overall operation'" is not determinative of the defendant's responsibility.[35]

Once a court determines the scope of the criminal activity, the Guidelines make the defendant responsible for any reasonably foreseeable action performed in furtherance of that activity "'regardless of whether the defendant acted to promote it or facilitate it.'"[36] The court must therefore determine which actions in furtherance of the illegal purpose were "reasonably foreseeable" to the defendant.

## B. *Pimentel* Letters

In *United States v. Pimentel*, two defendants who had been arrested after trafficking one kilogram of cocaine were convicted of a narcotics conspiracy.[37] According to section 2D1.4 of the November 1989 revision of the Guidelines (in effect at the time), the offense level of a defendant convicted of a narcotics conspiracy was the level that would apply if the object of the conspiracy had been completed. Defendants contended that they should only be held responsible for the single kilogram that they delivered to the undercover officer,

---

[35]    *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (quoting *Studley*, 47 F.3d at 575).

[36]    *United States v. Savarese*, 404 F.3d 651, 655 (2d Cir. 2005) (quoting *United States v. Medina*, 74 F.3d 413, 417 (2d Cir. 1996)).

[37]    *See* 932 F.2d 1029, 1031 (2d Cir. 1991).

11

but the district court determined that the defendants had negotiated to supply

undercover officers with two kilograms of cocaine. The Court of Appeals for the

Second Circuit determined that there was sufficient evidence to support the district

court's factual finding and that there was no violation of due process.[38]

> The Circuit then stated:

> [W]e are quite troubled by the escalating number of
> appeals from convictions based on guilty pleas in which
> the appellant claims that he was unfairly surprised by the
> severity of the sentence imposed under the Guidelines. In
> particular, we note the distressingly large number of
> appeals involving defendants indicted for drug offenses
> who, at the time of tendering their pleas, were apparently
> unaware of the quantity of drugs that could be included in
> calculating their base offense levels. While these
> defendants may have entered their pleas "knowingly and
> voluntarily" in the constitutional sense, we are, given our
> own struggles with the Guidelines, not unsympathetic to
> their claims that they did not fully appreciate the
> consequences of their pleas.[39]

The Circuit concluded that

> appeals involving claims of unfair surprise would be
> significantly reduced if the Government would at least
> inform defendants, prior to accepting plea agreements, as
> to the likely range of sentences that their pleas will
> authorize under the Guidelines. To be sure, the
> Government is under no legal obligation to provide this

---

[38] *See id.* at 1032.

[39] *Id.* (citations omitted).

12

information. However, given the Government's unique expertise in muddling through the complexities of the Guidelines, providing defendants with this information would hardly be a great burden. Certainly, it would take less time than having to brief and argue an entire appeal. In *Fernandez*, we recognized the desirability of having "each defendant, at the time of tendering a guilty plea, . . . fully cognizant of his likely sentence under the Sentencing Guidelines." Consequently, we suggested that district courts should, where feasible, explain to defendants before accepting their pleas what sentence is likely to be imposed. Here, we invite Government attorneys to play a similar role in helping to ensure that guilty pleas indeed represent intelligent choices by defendants.[40]

In response to *Pimentel*, the United States Attorney's Offices within the Second Circuit began routinely informing defendants of the likely range of sentences that their pleas would authorize under the Guidelines.[41] This generally takes the form of a letter sent to defendants. The Government is under no obligation to issue such a letter, however, and "the Government's estimate is not ordinarily binding on the District Court."[42]

"A sentence imposed pursuant to a plea agreement 'must follow the

---

[40]    *Id.* at 1034 (quoting *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989)) (other citations omitted).

[41]    *See generally United States v. Cuero-Flores*, 276 F.3d 113, 115 n.1 (2d Cir. 2002).

[42]    *Id.* (citing *United States v. Rosa*, 123 F.3d 94, 98-99 & n.3 (2d Cir. 1997)).

13

reasonable understandings and expectations of the defendant with respect to the bargained-for sentence.'"[43] However, a *Pimentel* letter is not a binding contract between the defendant and the Government and the estimated sentencing range discussed in the letter does not represent a bargained-for sentence.

## C. The Right to a Trial by Jury

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[44] "[T]he 'statutory maximum' . . . is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."[45] Thus, the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged."[46] Notwithstanding recent changes in the law relating to sentencing, courts retain the "'authority to find facts relevant to sentencing by a preponderance of the evidence

---

[43] *United States v. Palladino*, 347 F.3d 29, 33 (2d Cir. 2003) (quoting *United States v. Ferrara*, 954 F.2d 103, 105 (2d Cir. 1992)).

[44] *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

[45] *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (citation omitted).

[46] *United States v. Gaudin*, 515 U.S. 506, 511 (1995).

14

. . . ."[47] Such findings do not violate the defendant's right to a trial by jury.

### D.    Due Process

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."[48] Indeed, "our system of the administration of justice suffers when any accused is treated unfairly."[49] "Defendants are entitled to due process up to and through the imposition of sentence."[50] "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice."[51]

Prosecutors have a special role in our system of justice. Their function is not solely to advocate for the guilt of the defendant – rather, their goal must be truth and fairness. "For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his

---

[47]    *United States v. Brown*, 514 F.3d 256, 269 (2d Cir. 2008) (quoting *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005)).

[48]    *California v. Trombetta*, 467 U.S. 479, 485 (1984).

[49]    *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[50]    *United States v. Madkour*, 930 F.2d 234, 238 (2d Cir. 1991) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)).

[51]    *Lisenba v. California*, 314 U.S. 219, 236 (1941).

client's overriding interest that 'justice shall be done.'"[52]

## IV. DISCUSSION

### A. Findings of Fact

I find that the Government has proven by a preponderance of the evidence the following facts: Angel Martinez, also known as "Druggie Lou," operated a crack cocaine distribution organization in the vicinity of 1170 Girard Avenue ("1170").[53] The Organization, owned by Martinez, consisted of an individual, "Louie Lou," who created bundles of crack cocaine and transferred them to a manager, Terrence Davis.[54] Davis orchestrated the work of retail distributors ("pitchers") who sold crack cocaine to customers.[55] Members of the Organization often spent time in an apartment on the fifth floor of 1170, where the Organization kept several firearms.[56]

One way that customers could purchase crack cocaine was by walking

---

[52]     *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

[53]     *See* 3/17/08 Transcript ("Tr.") at 203:24-204:3 (testimony of Special Agent Joseph Kaleta of the Drug Enforcement Agency).

[54]     *See id.* at 28:25-29:2 (testimony of Cooperating Witness One ("CW1")).

[55]     *See id.* at 204:1-3 (testimony of Kaleta).

[56]     *See id.* at 40:17-42:1 (testimony of CW1).

16

outside of 1170 and signaling the pitchers, often by whistling. When they did so, the pitchers would stick their heads out of a third-floor window and observe the potential buyers.[57] If the buyers were known customers or otherwise acceptable, the pitchers would either emerge to sell them crack cocaine, or the buyers would enter the building and purchase crack cocaine from the pitchers.[58]

The Organization sold crack twenty-four hours per day, seven days per week. Pitchers for the Organization would work one of two twelve-hour shifts – the day shift (8:00 a.m. to 8:00 p.m.) or the night shift (8:00 p.m. to 8:00 a.m.).[59]

The Organization sold crack cocaine in bundles.[60] Each bundle was a

---

[57]     *See id.* at 210:17-24 (testimony of Kaleta).

[58]     *See id.*; *id.* at 30:14-31:23 (testimony of CW1); *id.* at 140:10-23 (testimony of Cooperating Witness Two ("CW2")).

[59]     *See id.* at 29:11-18 (testimony of CW1). *Accord id.* at 141:1-11 (testimony of CW2).

[60]     Because exact measurements of the quantity of narcotics sold by the Organization and by defendants are not available, the Court will determine a reasonable range of the quantities involved and will base its estimates on the low end of range. *See United States v. Prince*, 110 F.3d 921, 925 (2d Cir. 1997) ("In the absence of a drug seizure, the district court must 'approximate the quantity of the controlled substance.' The district court's estimation need be established only by a preponderance of the evidence.") (quoting Guidelines § 2D1.1 cmt. n.12) (citing *United States v. Moore*, 54 F.3d 92, 102 (2d Cir. 1995)).

large plastic bag that contained fifteen smaller plastic bags.[61] The retail price of a bundle was $150, of which the pitcher would keep $30 to $40.[62] The Government has demonstrated that each smaller bag contained on average about one hundred and seventy milligrams of crack cocaine, with minimal variance.[63] Each bundle therefore contained, on average, about two and one half grams of crack cocaine.

There is significant variance in the number of bundles a pitcher might sell. One former pitcher testified that he sold on average four to five bundles per shift.[64] Another testified that he sold on average six to ten bundles.[65] Sales were

---

[61]    See Tr. at 32:23-24 (testimony of CW1). *Accord id.* at 142:8-22 (testimony of CW2). Some bundles would contain fewer bags, but some of these bags would be "doubles," so the net weight of the crack cocaine would be the same. *See id.* at 289:22-290:2 (testimony of Kaleta).

[62]    See id. at 33:18-21 (testimony of CW1, claiming $30 profit); *id.* at 142:20-22 (testimony of CW2, claiming $40 profit). *But see id.* at 233:15-23 (observing that one of the controlled purchases was of five bundles for $500).

[63]    See Tr. at 215:17-24; 218:15-17; 220:15-23 (Kaleta reporting that three controlled purchases of crack cocaine recovered bags that weighed on average .17 grams); *id.* at 290:9-19 (reporting that a third controlled purchase recovered thirty-one bags that contained 5.4 grams of crack cocaine, on average .17 grams per bag). *Cf. United States v. Pirre*, 927 F.2d 694, 696-97 (2d Cir. 1991) (approving of the calculation of the weight of fifteen bricks of cocaine where the bricks were identical by averaging the weight of two bricks and multiplying by fifteen).

[64]    See Tr. at 34:15-22 (testimony of CW1).

[65]    See id. at 147:8-14 (testimony of CW2).

18

better on the night shift.[66] It may safely be assumed that a pitcher could sell on average at least four bundles (ten grams of crack cocaine) per shift. The Organization thus sold about twenty grams of crack per day, six hundred grams per month, in excess of seven kilograms per year.

Valerio was a pitcher for the Organization from at least early 2005 to November of 2006 (approximately one and one-half years).[67] Valerio frequently worked for the Organization, averaging five shifts per week.[68] On average, Valerio likely sold about ten grams per shift, or fifty grams per week, two and one half kilograms per year, or, in total, almost four kilograms of crack cocaine. The evidence also shows that Valerio (among other members of the conspiracy) possessed a firearm at the apartment on the fifth floor of 1170.[69] The firearm was clearly connected to the narcotics business of the Martinez Organization.

The evidence, although weaker, also demonstrates that Allen was a

---

[66] *See id.* at 34:15-22 (testimony of CW1).

[67] *See id.* at 34:25-36:12 (testimony of CW1); *id.* at 126:13-17; 144:25-145:9 (CW1 states that Valerio frequently worked the shift that followed CW1's shift); *id.* at 147:15-24 (CW2 testified that Valerio frequently worked the day shift).

[68] *See id.* at 205:4-11 (testimony of Kaleta).

[69] *See id.* at 102:3-18 (testimony of CW1). *See also id.* at 153:1-9 (testimony of CW2).

19

pitcher for the Organization.[70] Allen began working for the Organization no later than early 2005 and continued until the Organization was disrupted by law enforcement in November of 2006.[71] Based on the witnesses' testimony, I estimate that Allen most likely worked at least one shift per week, at times in cooperation with Valerio.[72] Allen thus sold at least ten grams per week, five hundred and twenty grams per year, for a total of seven hundred and eighty grams of crack cocaine.

## B. Relevant Conduct

The Government has proven by a preponderance of the evidence that Valerio and Allen distributed crack cocaine on behalf of the Organization. The conduct to which defendants pled guilty is clearly part of the same course of conduct as their other sales on behalf of the Organization.[73] The parties dispute

[70]     *See id.* at 34:25-35:21, 42:14-21, 43:13-18, 126:20-21 (testimony of CW1). *Accord id.* at 144:25-145:9; 189:16-20 (testimony of CW2).

[71]     *See id.* at 36:4, 36:25 (testimony of CW1).

[72]     *See id.* at 194:21-195:2 (testimony of CW2 that Allen worked two shifts per week); *id.* at 233:15-240:24 (testimony of Kaleta that Allen was never observed selling crack cocaine and was only identified in surveillance reports once). CW1 states that he saw Allen sell crack cocaine fewer than ten times, *see id.* at 43:7-18, though he heard from another pitcher that Allen and Valerio had sold crack cocaine together several times, *see id.* at 44:18-21.

[73]     The crack cocaine purchased from defendants by the cooperating witness was priced differently from that of the Martinez Organization's crack

20

whether the Organization's distribution of crack cocaine should be included as relevant conduct for purposes of calculating defendants' sentences.

Based on the evidence presented, I find that the Government has proven by a preponderance of the evidence that the narcotics distribution activity of the Organization was within the scope of the criminal activity the defendants agreed to jointly undertake. Defendants joined the Organization knowing its purpose and illegal scheme and consciously decided to further that purpose. Defendants shared information with other pitchers to assist them in selling narcotics, swapped shifts with other pitchers to ensure that the Organization was distributing narcotics at all times, and worked in concert with other pitchers to sell crack cocaine.[74] Defendants effectively functioned as employees of the Organization.

Nonetheless, there is substantial evidence to the contrary. For

---

cocaine bundles. *See id.* at 233:15-23. However, the common facts between the controlled purchase and defendants' prior actions – the same customers, location, and narcotic substance – are sufficiently substantial to leave no significant question as to whether these sales represent the same course of conduct.

[74] For example, video surveillance introduced at the *Fatico* Hearing demonstrates that Valerio and another member of the Organization both responded when a potential customer appeared outside 1170. *See id.* at 270:4-9. There is also evidence that Allen and Valerio worked together at times to sell crack cocaine. *See, e.g., id.* at 45:3-12 (testimony of CW1).

example, defendants were paid only for the crack cocaine that they personally sold, suggesting an independent contractor relationship. However, this evidence is outweighed by the factors previously discussed. When viewed as a whole, the Government has shown by a preponderance of the evidence that defendants agreed to jointly undertake in criminal activity that encompassed all of the Organization's distribution.

I further find that the full scope of the Organization's distribution was reasonably foreseeable to defendants. Both defendants spent substantial time in 1170 and clearly knew the details of how the Organization distributed narcotics. The total amounts of crack cocaine distributed by the Organization were reasonably foreseeable to them.

## C.    Failure to Prove Certain Facts Beyond a Reasonable Doubt

Defendants' contention that a sentence imposed based on a quantity of crack cocaine significantly larger than that stated in the *Pimentel* Letters would deny them their right to a trial by jury is foreclosed by Second Circuit precedent. As long as the sentence does not exceed the statutory maximum, in this case forty years' imprisonment, there is no violation of the right to a trial by jury where a court "'find[s] facts relevant to sentencing by a preponderance of the evidence . . .

.'"[75]  "[W]hen a trial judge exercises . . . discretion to select a specific sentence

within a defined range, the defendant has no right to a jury determination of the

facts that the judge deems relevant."[76]

It may violate due process for a defendant to be charged with one

crime and then sentenced based on other crimes carrying a higher Guidelines

range.[77]  In this case, defendants admitted to distributing 5.4 grams of crack

cocaine.[78]  Neither defendant admitted possessing a firearm.  Defendants' base

offense level for this conduct would be 24.  With the three-level adjustment for

timely acceptance of responsibility, Allen could expect a sentence of 37 to 46

months, while Valerio could expect a sentence of 46 to 57 months.

Instead, based on conduct not proven beyond a reasonable doubt to a jury, the

---

[75]     *Brown*, 514 F.3d at 269 (quoting *Garcia*, 413 F.3d at 220 n.15).

[76]     *United States v. Booker*, 543 U.S. 220, 233 (2005).

[77]     *See generally Blakely v. Washington*, 542 U.S. 296, 306-07 (2004)
("The jury could not function as circuitbreaker in the State's machinery of justice
if it were relegated to making a determination that the defendant at some point did
something wrong, a mere preliminary to a judicial inquisition into the facts of the
crime the State actually seeks to punish."); *id.* at 344 (Breyer, J., dissenting) ("As
we have recognized, the 'tail' of the sentencing fact might 'wa[g] the dog of the
substantive offense.'  Congress might permit a judge to sentence an individual for
murder though convicted only of making an illegal lane change.  But that is the
kind of problem that the Due Process Clause is well suited to cure.") (quoting
*McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (alteration in *Blakely*)).

[78]     *See* Valerio Plea Tr. at 15-16; Allen Plea Tr. at 16-17.

Guidelines prescribe a sentence for Allen of 210 to 262 months, while Valerio

faces 262 to 327 months. The vastness of this disparity gives me pause. A

defendant who admitted to conduct that would send him to jail for less than four

years now faces imprisonment for nearly two decades.

Were the Guidelines mandatory, and no downward departure

available, this situation would present serious constitutional problems. Due

process of law has little meaning if it does not protect citizens from such arbitrary

exercises of power.

But the Guidelines are not mandatory.[79] Further, were defendants to

be sentenced in accordance with the Guidelines, a downward departure might be

appropriate. In *United States v. Cordoba-Murgas*, a defendant was convicted by a

jury of participating in a drug conspiracy, an offense for which the Guidelines

prescribed a term of imprisonment of 151 to 188 months.[80] Prior to sentencing,

---

[79]     They are, of course, still highly relevant to sentencing. *See Gall v. United States*, — U.S. —, 128 S. Ct. 586, 596 n.6 (2007) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."); *United States v. Williams*, — F.3d —, Nos. 05 Cr. 4416, 05 Cr. 6778, at 9-10 (2d Cir. Apr. 25, 2008) (determining that merely calculating a Guidelines sentence is insufficient – sentencing courts must use the Guidelines as the "initial benchmark"); *United States v. Cutler*, 520 F.3d 136, 163 (2d Cir. 2008) (criticizing a sentencing court for taking a position "contrary to the policy judgments articulated by the Sentencing Commission" in the Guidelines).

[80]     *See* 233 F.3d 704, 706-07 (2d Cir. 2000).

24

the government alleged that the defendant committed two murders in the course of the conspiracy and urged the sentencing court to apply sections 2D1.1(d)(1) and 2A1.1 of the Guidelines, which would have raised the defendant's sentence to life in prison.[81] Troubled by the significant impact of the murders on the defendant's sentence, the trial court required the government to prove the murders by clear and convincing evidence.[82] On appeal, the Second Circuit first determined that the lower court should have applied a preponderance of the evidence standard notwithstanding the extreme impact of the uncharged conduct on the defendant's sentence.[83] But the Circuit then determined that

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.[84]

The situation in *Cordoba-Murgas* exactly parallels that of these

---

[81]    *See id.* at 707.

[82]    *See id.*

[83]    *See id.* at 709.

[84]    *Id.* (citing *United States v. Concepcion*, 983 F.2d 369, 389 (2d Cir. 1992)).

25

defendants.[85] The related conduct increases their sentencing exposure *at least five-fold* for conduct proven only by a preponderance of the evidence. While I have no doubt that the conduct in fact occurred, reasonable people could differ as to whether that conduct is within the scope of the criminal activity in which defendants agreed to engage. Although as discussed above the Government has shown by a preponderance of the evidence that the Organization's distribution was within the scope of these defendants' agreement, I am skeptical that any rational jury could make this finding beyond a reasonable doubt.[86]

## D.    Youthful Offender Status

The Government indicated that it could have indicted defendants for distributing the larger quantity of crack cocaine, but was "generous" in not doing

---

[85]    Here, defendants were never charged with possession of a weapon.

[86]    I am especially concerned with respect to the finding that a firearm was possessed in connection with the activity of the Martinez Organization. The Government has introduced some circumstantial evidence to show that Allen knew of the firearm. *See* Tr. at 41:12-42:13 (CW1 observing that there were firearms in the fifth-floor apartment of 1170, one of which belonged to Valerio, and that Allen, Valerio's "best friend[]," was in the apartment "[a] number of times"); *id.* at 101:22-107:18 (CW1 discussing Valerio's firearm); *id.* at 186:23-187:23 (CW2 discussing firearms in that apartment); *id.* at 188:8-20 (CW2 stating that Allen was in that apartment "four or five times out of the week . . . on a regular basis"). While I realize that this evidence is sufficient to support a firearms enhancement by the Court pursuant to section 2D1.1(b)(1) of the Guidelines, no reasonable jury applying the standard of proof beyond a reasonable doubt could convict Allen for a firearms-related offense.

26

so.[87] The Second Circuit addressed a similar situation:

> the Government [asserted that Rosa received a favorable plea bargain because it had] refrained from charging Rosa on charges relating to sale of cocaine. The sentencing court could, however, have utilized the relevant conduct provision to penalize Rosa further for the cocaine-related conduct – conduct which, under the Guidelines, need only be proven by a preponderance of the evidence rather than the more stringent beyond a reasonable doubt standard which would be required had the Government been forced to prove its case at trial – and Rosa could be left with a result just as unfavorable (or even far worse) than he would have achieved had he been charged with the conduct. . . . The Government's so-called "sweet deal" is thus considerably soured by § 1B1.3(a)(1)(B).[88]

In this case, defendants' sentencing exposure would have been significantly less substantial had they been charged when the Government arrested the other members of the Martinez Organization. Because both defendants were under the age of eighteen at that time, they would have likely qualified for youthful offender status. The Government's decision to introduce the higher drug quantity as relevant conduct for these offenses, rather than charging it directly when both defendants were under eighteen, has resulted in the possibility of markedly longer

---

[87] *See* Tr. at 15:5-6 ("We told them we used our discretion not to charge them in that. I thought the government was being generous.").

[88] *Rosa*, 123 F.3d at 100 n.6.

27

prison terms.[89] The Guidelines should not be an end-run around the youthful

offender laws.

The Government's charging decision, while tinged with the

appearance of injustice, does not implicate any of defendants' constitutional

rights. Therefore, no judicial remedy is available, although defendants' age at the

time of the relevant conduct may be considered at sentencing.

## E. Unfair Surprise as a Result of the *Pimentel* Letters

The United States Attorney is the representative not of an

---

[89]    Based on the quantities stated in the *Pimentel* Letters, the Guidelines
call for sentences for Allen and Valerio of about seven to nine years and fourteen
to seventeen years in jail, respectively. Given the heightened quantities, the
Guidelines now specify sentences of about seventeen to twenty-two years for
Allen and about twenty-two to twenty-seven years for Valerio. I am deeply
troubled by the length of time these very young men will be incarcerated as
punishment for these drug offenses, not only because of the impact of such
sentences on their lives and on their communities, but also because of the
contribution of such long sentences to the American prison population. The
United States has a far higher incarceration rate than any other nation not because
we incarcerate more of our citizens, but because we imprison them for longer
periods than any other nation. *See generally* Adam Liptak, *Inmate Count in U.S.
Dwarfs Other Nations'*, N.Y. Times, Apr. 23, 2008, at A1 ("[I]t is the length of
sentences that truly distinguishes American prison policy. Indeed, the mere
number of sentences imposed here would not place the United States at the top of
the incarceration lists. If lists were compiled based on annual admissions to prison
per capita, several European countries would outpace the United States. But
American prison stays are much longer, so the total incarceration rate is higher.").
An incarceration rate six times that of other industrialized nations requires courts
to scrutinize carefully the length of the sentences the Government is seeking as to
these defendants.

ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[90]

The Government has struck hard at defendants Lewis Allen and Luis Valerio. I must now consider whether its actions cross the thin line that separates zealous advocacy from excessive prosecutorial zeal.

"[F]undamental fairness and public confidence in government officials require that prosecutors be held to 'meticulous standards of both promise and performance.'"[91] Indeed, it is widely recognized that a "prosecutor is charged with a dual responsibility – he must vigorously represent the interests of his client,

---

[90] *Berger v. United States*, 295 U.S. 78, 88 (1935).

[91] *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 296 (2d Cir. 1976) (quoting *Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973)).

the state, but he must also act zealously to ensure that justice is done."[92]

"The prosecution has a special duty not to mislead . . . ."[93] Whether

intentionally or otherwise, defendants have been misled. Defendants pled guilty

believing that they were confessing to distributing between 150 and 500 grams of

crack cocaine. The Government subsequently informed defendants that far more

was at stake.

## 1. Extent of the Government's Knowledge at the Time of the *Pimentel* Letters

The Government argues that it "did not recognize [when] we wrote

the *Pimentel* letter, the extent of Mr. Valerio and Mr. Allen's involvement in the

Angel Martinez conspiracy. . . . The focus was not these two defendants until the

government got a cooperating witness in early March of 2007 who discussed

violence that these defendants committed . . . . Then they became high on our

radar."[94]

This explanation is clearly inadequate. The *Pimentel* Letters were

---

[92]     *Taylor v. Curry*, 708 F.2d 886, 890 (2d Cir. 1983) (citations omitted). *Accord* N.Y. Code of Prof. Resp., Ethical Consideration 7-13 ("The responsibility of a public prosecutor differs from that of the usual advocate; it is to seek justice, not merely to convict."), *codified*, N.Y. Jud. L., app'x.

[93]     *United States v. Universita*, 298 F.2d 365, 367 (1962).

[94]     Tr. at 15:20-16:7.

written in July of 2007. Confronted with this timeline, the Government

maintained that it "did not know the[] extent [of their activity], their being core

pitchers in the Angel Martinez organization at this point."[95] But in March of 2007,

at Valerio's detention hearing, the Government maintained that Valerio "was a

street level pitcher" for the Organization and is "on tape recorded calls, pictures,

video" selling narcotics.[96] The Government also suggested that Valerio was

involved in a murder.[97]

Well before the *Pimentel* Letters were written, the Government knew

that defendants were pitchers for the Organization, knew the extent of the

Organization's narcotics sales (the Organization was taken down by the DEA in

2006), suspected that Valerio was involved in crimes of violence, and had both

audio tapes and surveillance records of Valerio engaging in substantial narcotics

distribution.[98] There has been no credible explanation of what the Government

learned since July of 2007 that justifies its change of position.

---

[95] *Id.* at 16:9-11.

[96] Valerio Hearing at 3.

[97] *See id.* at 4. I note that the Government has not charged Valerio with an act of violence and introduced no evidence at the *Fatico* Hearing regarding any such violence. The Government's unsupported allegations carry no weight.

[98] *See id.* at 3.

31

The Government asserts that it gained information from cooperating witnesses regarding defendants' role in the Organization. Disturbingly, the Government observed that even if it had that information prior to the issuance of the *Pimentel* Letters, it would still have issued the letters (knowing them to be deceptive) because it was "office policy not to use [that] information" prior to the time that the witnesses signed the cooperation agreements.[99] In other words, even had the Government known of the scale of defendants' distribution and intended on introducing this information as relevant conduct for sentencing purposes, the Government would have sent deceptive *Pimentel* Letters ("[t]he foregoing Guidelines calculation is based on the facts and information presently known to the Office") because of its internal office policy.

Faced with this evidence, I am forced to conclude that the Government misrepresented the state of its knowledge. Prior to the issuance of the *Pimentel* Letters, the Government almost certainly knew all of the relevant facts, yet the letters (allegedly based on the Government's knowledge) did not square with the Government's determination of relevant conduct.

I do not mean to suggest that any individual officer of the

---

[99]     Tr. at 313:1-8. When pressed at oral argument, the Government conceded that this argument was "less compelling." *Id.* at 313:19-22. It remains troubling notwithstanding the Government's concession.

Government acted with malicious intent. There is no evidence that the Government sought to induce defendants to plead guilty by concealing an intention to introduce the larger drug quantities for sentencing purposes.

However, just as cases governing the withholding of *Brady* evidence have determined that "'[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation,'"[100] so here the Government is charged with knowledge of the extent of its own investigation. While I do not conclude that any individual acted in bad faith, nonetheless I cannot escape the conclusion that defendants have been fundamentally mistreated.[101]

## 2. Prejudice

As discussed above, defendants "are entitled to due process up to and through the imposition of sentence."[102] Due process in this context means exactly that which Allen and Valerio were denied – "that fundamental fairness essential to

---

[100]     *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (quoting *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995)).

[101]     *See Brady*, 373 U.S. at 88 (observing that a prosecutor who withholds exculpatory evidence becomes cast "in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile' . . . .").

[102]     *Madkour*, 930 F.2d at 238 (citing *Pugliese*, 805 F.2d at 1122).

the very concept of justice."[103] Unfortunately, the Government has fallen substantially short of the "'meticulous standards of both promise and performance'" to which it must conform.[104]

However, rather than causing prejudice to these defendants, this misconduct damages the integrity of our justice system. There is no reasonable doubt that defendants are guilty of the crimes with which they were charged or that they were associated with the Martinez Organization, which distributed the larger amount of crack cocaine. Defendants pled to the crimes charged in the Indictments and were not promised any benefit in return for their pleas. There would be an injustice if defendants escaped *liability* for these offenses, although the effect of this conduct on their *sentences* is a different matter. The dangers here are the appearance of impropriety and the risk that other defendants – perhaps innocent defendants who, based on the Government's representations of a lighter sentence, prefer the surety of a short prison term to the risk of a long one – might find themselves in the worst of both worlds, facing longer penalties without the protection of "guilt beyond a reasonable doubt."

---

103   *Lisenba*, 314 U.S. at 236.

104   *Palermo*, 545 F.2d at 296 (quoting *Correale*, 479 F.2d at 947).

### 3. Remedy

The harm here is a violation of our notions of fundamental fairness. The guilty too are entitled to fair treatment from the Government. Similar to the position of a defendant invoking the exclusionary rule, defendants stand before the Court as both perpetrators of a crime against society and victims of mistreatment by society's representative.

But there is no exclusionary rule for the Government's misrepresentations. Defendants' request that the Government be estopped from proving that defendants were involved with the Organization must be denied. The *Pimentel* Letters did not form a contract between defendants and the Government. The letters explicitly disclaimed any promises. Defendants stated that they understood the maximum penalties for their crimes and that there were no controlling promises that bound the sentencing court.[105]

Defendants pled guilty to the distribution of more than five grams of crack cocaine, and substantial evidence demonstrates that they distributed large amounts of crack cocaine on behalf of the Martinez Organization. Indeed, at their

---

[105]    *See* Allen Plea Tr. at 13-14; Valerio Plea Tr. at 12. For the same reasons, I reject Valerio's suggestion that the Government be estopped from asserting the broader conduct on the ground that it refused to produce the audio tape.

plea allocations they were informed of the maximum forty-year penalty rather than

any advisory Guidelines range. To hold that the *Pimentel* Letters were

nonetheless binding on the Government would contradict the plain language of the

letters and bestow an undeserved benefit upon defendants, not to mention provide

the Government with a motive not to issue *Pimentel* letters in the future. Indeed,

courts have uniformly rejected attacks on sentences where the ground is that the

defendant was deceived by the *Pimentel* letter.[106]

Defendants have not moved to withdraw their guilty pleas. Potential

grounds for doing so are that they were obtained involuntarily and that they offend

due process. Because defendants have not requested this relief, any discussion of

its availability would be premature and I express no opinion as to the resolution of

any such motion.

---

[106]     *See, e.g., Camposano v. United States*, 431 F. Supp. 2d 399 (S.D.N.Y. 2006) (rejecting an attack on a sentence where the *Pimentel* letter prescribed a criminal history level of III, but the sentencing court determined that the correct level was IV); *Bretan v. United States*, No. 05 Civ. 0916, 2006 WL 238994 (S.D.N.Y. Jan. 31, 2006) (rejecting an attack on a sentence of 57 months based in part on a *Pimentel* letter that prescribed a sentence of 41 to 51 months); *Montilla v. United States*, No. 06 Civ. 3893, 2006 WL 2527809, at *2 (S.D.N.Y. Sept. 1, 2006) (rejecting an attack based on a *Pimentel* letter where "the letter's calculation of punishment was based on an earlier version of the facts"). *See also United States v. Briceno*, No. 01 Cr. 943, 2003 WL 22025870, at *2 (S.D.N.Y. Aug. 29, 2003) (rejecting the defendant's argument that the Government should be held to assertions made in a *Pimentel* letter).

One final possibility is a downward departure or a non-Guidelines sentence. I do not believe that such relief would always be appropriate where a defendant's relevant conduct does not match that stated in a *Pimentel* letter. However, in this instance, I must take note of the unusual situation created by the Government's misrepresentations. I cannot ignore the Government's mistreatment of defendants. In light of the circumstances of this case, the youth of the defendants at the time of the relevant conduct, the actions of the Government, the disparity in sentencing caused by the inclusion of relevant (and to some extent uncharged) conduct, and the role of the defendants in the criminal activity, this relief may be appropriate.[107]

## V. CONCLUSION

Defendants' motions to estop the Government from introducing evidence as to their activities in connection with the Martinez Organization is denied. I hereby notify the Government that I am considering both a downward departure from the Guidelines and a non-Guidelines sentence. The sentencing of defendant Allen is scheduled for May 28, 2008, at 12:00 p.m. The sentencing of

---

[107]    I cannot help but pause to consider the circumstances that have led to a situation in which a projected sentence of a decade of incarceration for two young men for being street-level dealers before they were eighteen years old could be viewed as insufficiently harsh.

37

defendant Valerio is scheduled for Tuesday, June 3, 2008, at 4:30 p.m. If

defendants wish to move for leave to withdraw their guilty pleas, they must notify

the Court and the Government no later than ten days from the date of this Opinion.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
          April 29, 2008

**- Appearances -**

**For the Government:**

Michael Q. English
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2594

**For Defendant Allen:**

Michael H. Sporn, Esq.
Law Office of Michael H. Sporn
299 Broadway, Suite 800
New York, NY 10007
(212) 791-1200

**For Defendant Valerio:**

Don D. Buchwald, Esq.
Kelley Drye & Warren
101 Park Avenue
New York, NY 10178
(212) 661-0040